# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs at Knoxville May 20, 2014

## STATE OF TENNESSEE v. DARRELL RAY BEENE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-868    Cheryl Blackburn, Judge**

---

**No. M2013-02098-CCA-R3-CD - Filed June 20, 2014**

---

Darrell Ray Beene ("the Defendant") was convicted by a jury of one count of robbery and one count of criminal attempt to commit especially aggravated kidnapping. The trial court sentenced the Defendant to an effective term of forty-two years' incarceration. In this direct appeal, the Defendant challenges the sufficiency of the evidence and his consecutive sentences. Upon our thorough review of the record and applicable law, we affirm the trial court's judgments.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Kara Everett, Nashville, Tennessee, for the appellant, Darrell Ray Beene.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with one count of aggravated robbery and one count of especially aggravated kidnapping, allegedly committed with co-defendant Tony Dometrica Brown on January 1, 2012, against victim Brooke Babington. The Defendant was tried before a jury, and the following proof was adduced:

Brooke Babington testified that she was living at an apartment complex in Davidson County, Tennessee, on January 1, 2012. On that evening, she was returning to her apartment after dinner at approximately 9:20 p.m. She parked her car in her usual spot in the parking lot, got out of her car, and opened the back door on the driver's side to retrieve some things. As she was bent over, she heard a voice on her right side say, "I'm going to help you with that." She looked over her right shoulder and saw a black man she did not recognize. When she turned around, she saw a second unknown black man on her other side.

The man who had spoken to her took her wallet, keys, diabetes supplies, and the bag of dining leftovers she was carrying. The other man took her purse, which she was wearing across her shoulder. She identified the Defendant as the man who took her purse, and she referred to the other man as "Brown." After the men took her property, Brown – the man who had initially spoken to her – pressed a small black handgun to her back and told her "that [she] was going with them down the hill." The Defendant closed the rear driver's side door of her car. The men then took her to the front of her car, with the Defendant in front of her holding her right arm and Brown on her left behind her, "pushing." They walked across the sidewalk, took a few steps onto the grass, and the victim looked at the "long dark hill below." Afraid that the men wanted more than her property, she "threw [her] left arm" and ran up the flight of stairs to her apartment. The men started to follow her, but her roommate's boyfriend, Sean Burk, answered her door. She told Burk that she had been robbed, and Burk began to run after the two assailants. The victim's boyfriend, Daniel Henderson, then arrived in his truck. Burk got in Henderson's truck, and they pursued the robbers. The victim called 911.

According to the victim, the police arrived and went looking for Burk and Henderson. Burk and Henderson caught the Defendant, and the police took the Defendant into custody. The victim then identified the Defendant as one of her assailants. She recovered her purse because Henderson had recovered it from the Defendant.

On cross-examination, the victim stated that about four to five minutes elapsed between the time her items were taken and her arrival at her front door. She was not aware of the gun until after her wallet and purse were taken. She never saw the Defendant with a gun. The men walked her about ten feet.

Sean Burk testified that his girlfriend lived with the victim at the apartment complex in January 2012. On the evening of January 1, 2012, he was at their apartment visiting. He and his girlfriend were watching television when they heard "a loud pounding on the door." Burk opened the door and saw the victim, who told him that she had been robbed. He described her state of mind as "[p]anic." He saw the two assailants "[d]irectly behind her on the stairs at the bottom of the steps." He saw that the men were holding a fast food bag and a purse. Burk "took off after them." As he was running, he saw the victim's boyfriend drive

up. Burk jumped in the back of Henderson's truck, and Henderson pursued the running men. The assailants split up, and Burk ran after the man carrying the purse. Burk and Henderson caught the man with the purse. Burk identified the Defendant as the man they caught. They turned the Defendant over to the police after the police arrived on the scene. The victim's purse was returned to her.

Daniel Henderson, the victim's fiancé, testified that he lived in Illinois in January 2012 but was visiting the victim at her apartment. On the evening of January 1, 2012, they drove their separate vehicles to a restaurant for dinner. After they left the restaurant, Henderson stopped for gas on his way back to the victim's apartment. As he thereafter drove toward her apartment, he saw two men running away from the vicinity of the victim's car. He saw that one of the men was carrying the victim's purse. He then saw Burk running out of the apartment. Burk told him that the victim had been robbed and jumped in the back of Henderson's truck. Henderson drove after the man with the purse. When the man ran between two apartment buildings, Henderson and Burk got out of the truck and ran after the man. When they caught him, the man still had the victim's purse. After they caught him, they borrowed a phone and called 911. Henderson and Burk held the man until the police arrived and then gave the man to the police. Henderson identified the Defendant as the man they caught.

On cross-examination, Henderson stated that he never saw the Defendant with a weapon.

Officer Joshua Hargrave of the Metro Nashville Police Department ("MNPD") testified that he was the first officer to report to the scene. He took a statement from the victim. Another officer who responded arrived with a suspect in the back of his patrol car. Officer Hargrave identified the Defendant as the person in the back of the patrol car.

Officer Quinn White of the MNPD was the second officer at the scene. Since Officer Hargrave was with the victim, Officer White began looking for the suspects. He saw "a gentleman with no shirt on sitting on top of another gentleman waving at [him], kind of trying to get [his] attention." Officer White drove up and took the alleged suspect into custody, placing him into the back of his patrol car. He also seized a purse. Officer White identified the Defendant as the person he took into custody. Officer White drove back to the victim's apartment.

On cross-examination, Officer White testified that the Defendant did not have a weapon on him when Officer White took him into custody.

Officer Charles Linville of the MNPD testified that he went to the apartment complex on January 4, 2012, and took photographs of a handgun that had been located in the grass

behind one of the apartment buildings. He then collected the gun, which he described as a Crosman $CO_2$-powered air pistol. He was unable to collect any fingerprints from the gun.

Detective Frederick Heiman also responded to the scene between 9:30 and 9:45 p.m. on January 1, 2012. When he arrived, one suspect was in custody and officers were searching for the other suspect. Det. Heiman identified the Defendant as the suspect in custody. After Det. Heiman spoke with the victim, he conducted a "showup" by letting the victim view the Defendant while he was in custody. The victim positively identified the Defendant.

On cross-examination, Det. Heiman acknowledged that the Defendant told him Brown's name and general address. The Defendant also provided a description of the gun that Brown had used and where it could be located. The Defendant described the gun as a .25 semi-automatic.

The State rested its case after Det. Heiman's testimony, and the defense presented no proof. After deliberating, the jury convicted the Defendant of robbery, a lesser-included offense of aggravated robbery, and of criminal attempt to commit especially aggravated kidnapping, a lesser-included offense of especially aggravated kidnapping. After a sentencing hearing, the trial court sentenced the Defendant as a Range III (persistent) offender to fourteen years for the robbery offense and to twenty-eight years for the attempt to commit especially aggravated kidnapping offense. The trial court ordered the Defendant to serve these sentences consecutively after concluding that he was a dangerous offender. Thus, the Defendant was ordered to serve an effective term of forty-two years in the Department of Correction.

The Defendant timely perfected his direct appeal and now challenges the sufficiency of the proof and the trial court's imposition of consecutive sentences.

**Analysis**

*Sufficiency of the Evidence*

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does

not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted).

This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

## Robbery

The jury convicted the Defendant of robbery, defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). The Defendant contends that the State failed to prove that he took property from the victim by putting the victim in fear. The State disagrees.

Our supreme court has declared that the fear referred to in the robbery statute "is a 'fear of bodily danger or impending peril to the person, which intimidates and promotes submission to the theft of the property.'" State v. Dotson, 254 S.W.3d 378, 395 (Tenn. 2008) (quoting State v. Bowles, 52 S.W.3d 69, 80 (Tenn. 2001)) (internal quotation marks omitted). "The test may be properly described as objective rather than subjective in nature." Id. Thus, this element is to be determined by the jury on the basis of whether all of the evidence demonstrated that "the victim was placed in fear by the conduct of a defendant or should have been under the circumstances." Id. at 396.

The Defendant contends that the evidence did not demonstrate that the victim had been placed in fear at the time her property was taken because she had not yet been made aware of the handgun. We disagree. The record demonstrates by overwhelming evidence that the female victim was approached late at night by two unknown men as she was alone and trying to retrieve items from her car in a parking lot. The men stood on either side of her as she stood with her back against her car, effectively trapping her. The men did not introduce themselves but instead demanded, and took, her property. We hold that this evidence was sufficient to establish that the Defendant's actions would have placed a reasonable person in fear. Accordingly, the Defendant is entitled to no relief on this basis.

## Attempt to Commit Especially Aggravated Kidnapping

The offense of especially aggravated kidnapping is statutorily defined as "false imprisonment . . . [a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1) (2010). A person commits false imprisonment when he or she "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302(a) (2010). Additionally,

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Id. § 39-12-101(a)(3) (2010). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Id. § 39-12-101(b). Finally, "[a] person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (2010).

The Defendant contends that the proof demonstrated that the victim's movement by her assailants was "essentially incidental" to the robbery. He relies on our supreme court's decision in State v. White, in which our high court construed our kidnapping statutes as "evinc[ing] a legislative intent to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." 362 S.W.3d 559, 576-77 (Tenn. 2012). Thus, the jury must have before it sufficient proof from which to conclude that the victim's confinement or movement was "significant enough, standing alone, to support a conviction" rather than being merely "incidental to the accompanying felony." Id. at 578.[1]

The proof in this case permitted the jury to conclude that the robbery was complete by the time Brown, the Defendant's cohort, placed a gun in the victim's back and told her that she was going with them down the hill. The Defendant then took hold of the victim's right arm, Brown took hold of her left arm, and the two men marched the victim to the front of her car, across the sidewalk, and several steps into the grass toward the bottom of the hill

---

[1] The record reflects that the trial court charged the jury on the kidnapping offense as prescribed in White. See White, 362 S.W.3d at 580-81.

before the victim broke free and ran away. This proof was more than sufficient for the jury to conclude that the Defendant and Brown, working together and toward the same purpose, confined and moved the victim an appreciable distance away from the scene of the robbery and after the robbery had been completed. Thus, the jury was entitled to conclude that the victim's confinement and movement were not incidental to the robbery and had criminal significance over and above the robbery. Accordingly, the Defendant is entitled to no relief on this basis.

The Defendant also contends that the proof was not sufficient to establish that he acted with the requisite culpable mental state or that he took a substantial step toward completing the crime. He argues that the proof established that it was Brown who held the gun and ordered the victim to move. Nevertheless, as set forth above, the proof demonstrated that the Defendant took hold of the victim's right arm and actively assisted in moving her away from her car. This conduct circumstantially established the requisite mental state of "knowing"[2] and also directly established a substantial step toward the commission of an especially aggravated kidnapping. See State v. Bobby Stanley George, No. M2012-01542-CCA-R3-CD, 2013 WL 4647626, at *7 (Tenn. Crim. App. Aug. 26, 2013) (holding evidence sufficient to support attempted especially aggravated kidnapping conviction where defendant grabbed victim and held him for a few seconds before victim was pulled from defendant's grasp), perm. app. denied (Tenn. Jan. 15, 2014). Under the doctrine of criminal responsibility for the conduct of another, the fact that only Brown was armed is irrelevant. The Defendant knew Brown was armed and was actively assisting Brown in attempting to falsely imprison the victim with the use of a gun. The jury had before it sufficient proof from which to conclude that the Defendant committed criminal attempt to commit especially aggravated kidnapping. Accordingly, the Defendant is entitled to no relief on this basis.

*Sentencing*

After a sentencing hearing, the trial court sentenced the Defendant as a Range III (persistent) offender to fourteen years' incarceration for the robbery offense and to twenty-eight years' incarceration for the attempted especially aggravated kidnapping offense. The trial court also ordered the Defendant to serve these sentences consecutively after finding the Defendant to be a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(4) (2010). The Defendant contends that the trial court erred in ordering him to serve his sentences consecutively.

---

[2] "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the persons's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2010).

Prior to imposing sentence, a trial court is required to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections ] 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2010).

The referenced "principles of sentencing" include the following: "the imposition of a sentence justly deserved in relation to the seriousness of the offense" and "[e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs." Tenn. Code Ann. § 40-35-102(1), (3)(C) (2010). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Id. § 40-35-103(4), (5) (2010).

Our Sentencing Act also mandates as follows:

In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Additionally, a sentence including confinement should be based on the following considerations:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(1).

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). This same standard of review applies to a trial court's order of consecutive service. See State v. Pollard, No. M2011-00332-SC-R11-CD, __ S.W.3d __, __, 2013 WL 6732667, at *9 (Tenn. 2013) ("So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal.") (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.; see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A trial court may order a defendant to serve his sentences consecutively after finding by a preponderance of the evidence that he "is a dangerous offender whose behavior

indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). Before imposing consecutive service on this basis, however, the trial court also must conclude that the proof established "that the aggregate sentence reasonably relates to the severity of the offenses and that the total sentence is necessary for the protection of the public from further crimes by the defendant." Pollard, __ S.W.3d at __, 2013 WL 6732667, at *11 (citing State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)).

In this case, the trial court reviewed the Defendant's prior convictions which included two attempted rapes, an aggravated kidnapping, and an aggravated rape. The Defendant was sentenced to twenty-five years "to serve" for the aggravated rape conviction and committed the instant crimes "shortly" after being released from prison. The trial court stated from the bench,

> I'm finding that he's a dangerous offender and that the aggregate term reasonably relates to the severity of the offenses and is necessary in order to protect the public from further serious criminal conduct by the defendant. Clearly he is a dangerous offender. He has been convicted of very serious offenses, the aggravated rape, the aggravated kidnapping, other attempted rapes, which occurred even before then, before he was put in prison. And now shortly thereafter we have the . . . attempted especially aggravated kidnapping and the robbery. All that cries out for consecutive sentences in this case.

The Defendant argues that consecutive service should not have been imposed because Brown was the leader in the commission of these offenses while the Defendant's role was "small" and because the Defendant assisted law enforcement in locating Brown and the gun.

We hold that the record supports the trial court's decision to impose consecutive service on the basis that the Defendant is a dangerous offender. The Defendant's crimes against the victim were committed with a gun, of which the Defendant was aware, thereby demonstrating that the Defendant had "little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." That the Defendant may not have been the "leader" does not negate the active role he took in accosting the victim, taking her property, and, at gunpoint, bodily marching her away from her car and the parking area toward a secluded area where she was much less likely to be seen and/or heard and assisted. Moreover, the Defendant's engaging in these violent crimes shortly after being released from a prison term imposed for other violent crimes is a clear indication that society needs protection from the Defendant. Finally, the Defendant's assistance in locating Brown's handgun demonstrates that the Defendant was well aware that Brown had the gun, underlining the Defendant's willingness to participate in violent crimes. And while the Defendant's assistance in identifying Brown was commendable, it did not overcome his other

actions.  We also agree with the trial court that the forty-two year term reasonably related to these terrifying crimes.  The trial court committed no error in imposing consecutive service, and the Defendant is entitled to no relief on this basis.

## **Conclusion**

For the reasons set forth above, we affirm the trial court's judgments.


_____
JEFFREY S. BIVINS, JUDGE